### UNITED STATES BANKRUPTCY COURT
### MIDDLE DISTRICT OF NORTH CAROLINA
### WINSTON-SALEM DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **Jamie Dale Casper,** | ) | **Case No. 10-51047** |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| **Winston-Salem City Employees'** | ) | |
| **Federal Credit Union** | ) | |
| | ) | |
| Plaintiff, | ) | **Adv. Proc. No. 10-06048** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Jamie Dale Casper,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### MEMORANDUM OPINION

This adversary proceeding came on before the Court for trial in Winston-Salem, North Carolina on January 10, 2012 on the Winston-Salem City Employees' Federal Credit Union's ("Plaintiff") Complaint asserting claims against the Debtor pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(4). James Vaughan appeared on behalf of the Plaintiff and the Debtor appeared pro se. After considering the pleadings, evidence, and arguments of counsel, this Court makes the following findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure:

### PROCEDURAL BACKGROUND AND JURISDICTION

1

The Debtor filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code on June 4, 2010 (the "Petition Date"), and Edwin H. Ferguson was appointed as Chapter 7 Trustee (the "Trustee"). In the sworn bankruptcy schedules, the Debtor stated that he owed the Credit Union on a business debt for an unknown amount. The debt to the Credit Union was not listed as contingent or disputed. The Debtor's § 341 meeting was conducted on July 16, 2010. On August 31, 2010, the Plaintiff filed a Complaint objecting to the Debtor's discharge pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(4). The Debtor responded with an Answer filed on October 26, 2010.

The Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and Local Rule 83.11 of the United States District Court for the Middle District of North Carolina. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

The Plaintiff alleges that the debt owed by the Debtor to the Plaintiff is nondischargeable pursuant to § 523(a)(4) because it is a result of the Debtor's fraud while acting in a fiduciary capacity. At the outset of the trial, the Plaintiff's attorney informed the Court that the Plaintiff was dismissing its claim against the Debtor pursuant to § 523(a)(4) because there was no formal trust relationship between the parties. As such, the Court will not evaluate the merits of the Plaintiff's claim against the Debtor pursuant to § 523(a)(4).

### FINDINGS OF FACT

The Plaintiff is a federal credit union chartered under the laws of the United States of America and authorized to do business in the State of North Carolina. Part of the Plaintiff's business involves financing the purchase of motor vehicles for its members. The Plaintiff and the member would execute security documents and the Credit Union's lien would be noted on the

2

car title. The Credit Union would retain possession of the title until the loan was paid off.  In the event a member defaulted in payments to the Plaintiff on a loan secured by a motor vehicle, the Plaintiff repossessed the motor vehicle and foreclosed its security interest in order to liquidate its claim.

In mid-2007, in order to facilitate the foreclosure of its security interests, the Plaintiff procured the services of the Debtor, a member of the credit union and an officer at Jamie Casper Auto Sales ("Auto Sales").[1] The Debtor represented himself to be the owner of Auto Sales and the Plaintiff dealt with the Debtor exclusively when doing business with Auto Sales. The Debtor also signed documents and checks on behalf of Auto Sales. Pursuant to an oral understanding between the Plaintiff and the Debtor, Auto Sales was to place certain repossessed motor vehicles on its motor vehicle sales lot in order to sell the repossessed motor vehicles to third parties for the highest possible sales price. Auto Sales took other repossessed motor vehicles to auctions to sell on the Plaintiff's behalf. In order to facilitate the sale of the vehicles, the Plaintiff delivered possession of the motor vehicles to Auto Sales, along with the keys. When the Plaintiff dropped a motor vehicle off at the sales lot, the parties discussed the condition of the vehicle and, if necessary, the repairs required to return the vehicle to a marketable condition.

The Plaintiff retained the certificate of title to any motor vehicle delivered to Auto Sales and advised the Debtor of the amount of money required for the Plaintiff to deliver the certificate of title to Auto Sales. The parties then, in concert, determined an appropriate sales price for the vehicle. After the Debtor procured a potential buyer, he would contact the Plaintiff to advise that

---

[1]At the time of the transactions in question, Banks M. Woods was the owner of Jamie Casper Auto Sales.

3

a specific motor vehicle was subject to a contract for sale. If the amount of the sale proceeds from a prospective sale was sufficient, the Plaintiff would deliver the certificate of title, with the Plaintiff's security interest released, to the Debtor. In the ordinary course of dealings, the Debtor paid the Plaintiff the agreed amount of proceeds from the sale of a vehicle within two days after delivery of the certificate of title to Auto Sales. The procedure was slightly different for vehicles sold at auction. If a particular vehicle was to be auctioned, the Plaintiff would assign the title to the vehicle to Auto Sales prior to the auction. Monies would be remitted to the Plaintiff after the completion of the auction.

From the inception of the business agreement in 2007 to April of 2009, the Debtor successfully sold  repossessed vehicles for the Plaintiff. Each time the Debtor sold a repossessed vehicle, he would present a check for the sales proceeds to the Plaintiff shortly after the sale was consummated. There were occasions when the Debtor took longer than the customary two days to deliver the sales proceeds of a particular repossessed vehicle to the Plaintiff but the delay had never been for an extended period of time. During this period the Debtor dealt with the Plaintiff's employee, Carol Knott. In April, 2009, Carol Knott left the Credit Union and Brenda Walburn moved into the position previously held by her supervisor, Carol Knott.  The relationship between the Plaintiff and the Debtor began to change after the departure of Carol Knott. From April 2009 through November 2009, the Plaintiff continued to place cars for sale with Auto Sales. Ms. Walburn dealt exclusively with the Debtor and believed the Debtor to be the owner of the business.

On June 5, 2009, the Plaintiff assigned the title to a 2001 Pontiac Bonneville to Auto Sales. The Debtor signed the documents reassigning the title of the vehicle from the Plaintiff to

4

Auto Sales. On June 11, 2009, Auto Sales sold the vehicle to a purchaser for a cash price of $6,500.00. The Plaintiff never received payment for the sale of the 2001 Pontiac Bonneville.

On June 10, 2009, the Plaintiff assigned the title to a 1997 Jaguar XJ6 to Auto Sales. The Debtor signed the documents reassigning the title of the vehicle from the Plaintiff to Auto Sales. When the vehicle was dropped off at the sales lot, the Debtor discovered that the fuel rail in the vehicle was leaking. Auto Sales replaced the fuel rail, but the vehicle would still not pass inspection. The parties decided it best to sell the vehicle at wholesale for $100.00. The Plaintiff never received payment for the sale of the 1997 Jaguar XJ6.

On August 25, 2009, the Plaintiff assigned the title to a 2003 Hyundai Elantra to Auto Sales. The Debtor signed the documents reassigning the title of the vehicle from the Plaintiff to Auto Sales. The title to the vehicle was assigned several more times before it was sold to a purchaser for a cash price of $5,500.00. The Plaintiff never received payment for the sale of the 2003 Hyundai Elantra.

On August 25, 2009, the Plaintiff assigned the title to a 2001 Ford Escape to Auto Sales. The Debtor signed the documents reassigning the title of the vehicle from the Plaintiff to Auto Sales. Auto Sales assigned the title to a wholesale dealer that sold the vehicle to a purchaser for a cash price of $6,450.00. The Plaintiff never received payment for the sale of the 2001 Ford Escape.

On August 25, 2009, the Plaintiff assigned the title to a 2002 Cadillac Deville to Auto Sales. The Debtor signed the documents reassigning the title of the vehicle from the Plaintiff to Auto Sales. Auto Sales subsequently assigned the title of the vehicle to another dealer. The Plaintiff never received payment for the sale of the 2002 Cadillac Deville.

On August 27, 2009, the Plaintiff repossessed a 2005 Mazda Tribute, in which it retained a security interest, from a member who had defaulted in making payments to the Plaintiff. The Plaintiff assigned the title to the 2005 Mazda Tribute to Auto Sales shortly thereafter. Auto Sales assigned the title of the vehicle to another dealer that sold the vehicle to a purchaser for a cash price of $7,850.00. The Plaintiff never received payment for the sale of the 2005 Mazda Tribute.

On September 1, 2009, the Plaintiff assigned the title to a 2001 Mazda Tribute to Auto Sales. The Debtor signed the documents reassigning the title of the vehicle from the Plaintiff to Auto Sales. Auto Sales assigned the title of the vehicle to another dealer that sold the vehicle to a purchaser for a cash price of $4,700.00. The Plaintiff never received payment for the sale of the 2001 Mazda Tribute.

On September 1, 2009, the Plaintiff assigned the title to a 2002 Chevrolet Silverado to Auto Sales. The Debtor signed the documents reassigning the title of the vehicle from the Plaintiff to Auto Sales. When the vehicle was placed on the sales lot, it had no fenders, no bumpers, bent rims, and dents in the rear of the vehicle. Auto Sales assigned the title of the vehicle to another dealer that sold the vehicle to a purchaser for a cash price of $5,200.00. The Plaintiff never received payment for the sale of the 2002 Chevrolet Silverado.

On September 29, 2009, the Plaintiff assigned the title to a 2006 Chrysler Town and Country to Auto Sales. The Debtor signed the documents reassigning the title of the vehicle from the Plaintiff to Auto Sales. The Plaintiff never received payment for the sale of the 2006 Chrysler Town and Country.

On September 29, 2009, the Plaintiff assigned the title to a 2000 Cadillac Seville to Auto Sales. The Debtor signed the documents reassigning the title of the vehicle from the Plaintiff to

Auto Sales. When the vehicle was dropped off at the car lot, it had no tires and a number of bullet holes in it. The Plaintiff never received payment for the sale of the 2000 Cadillac Seville.

By October 2009, nearly six months after the Plaintiff first transferred the title of the 2001 Pontiac Bonneville to Auto Sales, the Plaintiff finally became concerned about the Debtor's failure to tender payment for any of the 10 vehicles. Ms. Walburn began calling the Debtor for payments on the vehicles. The Debtor advised Ms. Walburn that the monies would be remitted. In late November, the Debtor came into the Credit Union to transact personal business. Ms. Walburn approached him and demanded the monies from the vehicles. At that point the Debtor

admitted he was having "issues."

Ms. Walburn immediately advised her supervisor of the conversation. At that point in time the Credit Union had other vehicles (for which it still retained the titles) located on the Auto Sales lot. The following day, representatives of the Credit Union arrived unannounced at the Auto Sales lot with a rollback. After speaking with the Debtor, they picked up numerous vehicles and located another vehicle at a detail shop in Kernersville. Based on the inventory list maintained by the Plaintiff, it was determined that ten vehicles were unaccounted for.

The Plaintiff gave the Debtor a period of thirty days to return the ten missing vehicles or remit the monies from the sale of the vehicles to the Credit Union. No monies or vehicles were turned over to the Plaintiff.   No evidence was ever presented that the proceeds of the sale of the vehicles were paid to Auto Sales rather than the Debtor.


**<u>DISCUSSION</u>**

7

*I. Plaintiff's Claim Pursuant to § 523(a)(2)(A)*

Section 523(a)(2)(A) of the Bankruptcy Code provides as follows:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this
> title does not discharge an individual debtor from any debt–
> ...
> (2) for money, property, services, or an extension, renewal, or refinancing of
> credit, to the extent obtained by–
> (A) false pretenses, a false representation, or actual fraud, other than a
> statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523.

In order to establish the nondischargeablility of a debt under § 523(a)(2)(A), a creditor

must prove that: (1) the debtor made a representation; (2) at the time the representation was

made, the debtor knew the representation was false; (3) the debtor made the false representation

with the intention of deceiving the creditor; (4) the creditor relied on such representation; and (5)

the creditor sustained the alleged loss and damage as the proximate result of the false

representation. *MBNA Am. v. Simos (In re Simos)*, 209 B.R. 188, 191 (Bankr.M.D.N.C.1997); *In

re Booker*, 165 B.R. 164, 168 (Bankr. M.D.N.C. 1994).

Here the Credit Union must prove that the debt is nondischargeable by a preponderance

of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991). Any exception to discharge

must be strictly construed in favor of dischargeability. *In re Hudson*, 107 F.3d 355 (5th Cir.

1997). If the plaintiff makes a prima facie case, "then the burden of proof shifts to the debtor to

offer credible evidence to satisfactorily explain his or her conduct." *Arrow Concrete Co. v.

Bleam (In re Bleam),* 356 B.R. 642, 647 (Bankr. D.S.C. 2006) (citing *Farouki v. Emirates Bank

Intern., Ltd. (In re Farouki)*, 14 F.3d 244, 249-50 (4th Cir. 1994)).

8

The Plaintiff has established the first three elements of § 523(a)(2)(A) for all 10 of the missing vehicles. The Court finds that, in order to procure the title to each of the vehicles, the Debtor falsely represented that he would pay the agreed upon amount of the sales proceeds to the Plaintiff shortly after he had consummated the sale of the vehicle. The fourth and fifth elements, however, are much less straight forward.

The Court notes that officers of a corporation, as a general rule, are not liable for the debts of the corporation. Officers are, however, personally liable for their participation in tortious acts that cause harm to a third party. *E.g., Wilson v. McLeod Oil Co., Inc.* 327 N.C. 491, 517, 398 S.E.2d 586, 600 (N.C. 1990). This convention manifests itself "in the bankruptcy context where an individual debtor, as an officer of a corporation, actively participates in the improper disposition or conversion of property that is subject to the security interest of a third party." *Cmty. Sav. Bank, Inc. v. Rountree (In re Rountree)*, 2002 WL 832669, at *7 (Bankr. M.D.N.C. May 1, 2002). If the corporate officer actively participates in such activity, then the officer will be found personally liable and the liability may be nondischargeable. *Fresh W. Mktg, Inc. v. Pieper (In re Pieper)*, 119 B.R. 837, 840 (Bankr. M.D. Fla. 1990).

In the present case, there is no doubt that the Debtor actively participated in making the false representations that the Plaintiff relied upon. The Debtor signed all the documents reassigning the titles of the vehicles from the Plaintiff to Auto Sales. The Debtor also signed checks on behalf of Auto Sales. The Debtor represented himself to be the owner of Auto Sales and was the Plaintiff's sole contact at Auto Sales. Finally, no evidence was presented that the sales proceeds were deposited into Auto Sales checking account. Consequently, the Debtor is personally liable to the Plaintiff for the losses resulting from Auto Sales's false representations.

To succeed on a § 523(a)(2)(A) claim, the creditor's "reliance on the debtor's representation must be 'justifiable,' rather than 'reasonable.'" *In re Heilman*, 241 B.R. 137, 149 (Bankr. D. Md. 1999) (citing *Field v. Mans*, 516 U.S. 59, 70-71 (1995)). Unlike reasonableness, which employs a "community standard of conduct," justification looks to the "qualities and characteristics of the particular plaintiff, and the circumstances of the particular case." *Field,* 516 U.S. at 71. A plaintiff's contributory negligence does not bar recovery because fraudulent misrepresentation is an intentional tort. *Id.* at 70. Nevertheless, a plaintiff is still "'required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination and investigation.'" *Id.* at 71 (quoting Restatement (Second) of Torts § 541 cmt. a (1976)). Thus, a plaintiff who disregards "red flags" will not be able to satisfy the justifiable reliance standard. *Grayson, Kubli, & Hoffman v. Giovanni (In re Giovanni)*, 324 B.R. 586, 594 (E.D. Va. 2005) (citing *Am. Sav. Bank v. Anastas (In re Anastas)*, 94 F.3d 1280, 1286 (9th Cir. 1996)). *See also Copper v. Lemke (In re Lemke)* 423 B.R. 917, 924-25 (10th Cir. B.A.P. 2010) (holding that reliance was not justifiable because plaintiff continued to lend money "after various red flags arose"); *Rice, Heitman & Davis v. Sasse (In re Sasse)* 438 B.R. 631, 650 (Bankr. W.D. Wis. 2010) (denying plaintiff-law firm's claim pursuant to § 523(a)(2)(A) where plaintiff-law firm "ignored numerous red flags and warning signs"); *Andresen & Arronte, PLLC v. Hill (In re Hill)*, 425 B.R. 766, 779 (Bankr. W.D.N.C. 2010) (concluding that the plaintiff–law firm did not justifiably rely on the debtor's false representations because it continuously ignored warning signs regarding her financial condition); *Dominion Va. Power v. Robinson (In re Robinson),* 340 B.R. 316, 349-50 (Bankr. E.D. Va. 2006) (holding that plaintiff did not justifiably rely on

debtor's false representations because it continuously ignored "red flags" regarding debtor's behavior); *Weeber v. Boyd (In re Boyd)*, 322 B.R. 318, 325-26 (Bankr. N.D. Ohio 2004) (holding that the plaintiff's reliance was not justifiable because he had "special knowledge" of the risks associated with lending the debtor money).

Here, the Plaintiff disregarded critical warning signs. The Plaintiff transferred the title to the 2001 Pontiac Bonneville to Auto Sales on June 5, 2009. Based on the Plaintiff's policy of receiving payment for a repossessed vehicle within two days of assigning the title, the Plaintiff should have received payment for the vehicle by June 7, 2009. As noted above, the Plaintiff never received payment for the 2001 Pontiac Bonneville.  A few days later, on June 10, 2009, the Plaintiff transferred the title of a 1997 Jaguar XJ6 to Auto Sales. Considering the fact that delays had occurred on rare occasions in the past, the Plaintiff justifiably relied on the Debtor's representation that he would remit the proceeds from the sale of the Jaguar to the Plaintiff, despite not having remitted payment for the prior vehicle. The Plaintiff should have received payment for 1997 Jaguar XJ6 by June 12, 2009. When June 12, 2009 came and went without payment being tendered for either the 2001 Pontiac Bonneville or the 1997 Jaguar XJ6, the Plaintiff should have been put on notice that something had gone awry. It must be remembered that it was the Plaintiff's practice to only sign titles and remit them to Auto Sales when there was a pending sale or auction. Continuing to assign the titles of vehicles to Auto Sales with the expectation of receiving payment was not justifiable. A creditor must react in a timely fashion upon discovery of the falsity of a debtor's representation if justifiable reliance is to be established. *Stastny v. Sedivec (In re Sedivec)*, 396 B.R. 31, 34 (Bankr. N.D. Iowa 2008). The Plaintiff here—a sophisticated actor that is in the business of loaning and collecting

11

money—blindly ignored numerous red flags by continuing to do business with the Debtor even after he repeatedly failed to remit monies to the Plaintiff after the sale of a vehicle. Accordingly, the Plaintiff's § 523(a)(2)(A) claims regarding the 2003 Hyundai Elantra, the 2001 Ford Escape, the 2002 Cadillac Deville, the 2001 Mazda Tribute, the 2002 Chevrolet Silverado, the 2005 Mazda Tribute, the 2006 Chrysler Town and Country, and the 2000 Cadillac Seville must fail.

The Court now turns to the final element of § 523(a)(2)(A)—the damages caused by the Debtor's false representations. As the Plaintiff can only recover for the loss of the 2001 Pontiac Bonneville and the 1997 Jaguar XJ6, the Court need only address these two vehicles. In its estimation of the damages incurred for each vehicle, the Plaintiff used the National Automobile Dealership Association ("N.A.D.A.") retail value or the payoff for the vehicle at the time of repossession, whichever was less. The Plaintiff took into account mileage and condition of the vehicles when assigning a value. The Plaintiff acknowledges that it should not be permitted to recover the N.A.D.A. retail value for a vehicle when the loan balance was less than that amount.

This Court has held that standardized valuation guides such as N.A.D.A. may serve as the starting point for a finding of damages. *In re Brokers, Inc.* 407 B.R. 693, 725 (Bankr. M.D.N.C. 2009) (citing *In re Chrapliwy*, 207 B.R. 469, 473-74 (Bankr. M.D.N.C. 1996). However, "either party should be permitted to offer evidence regarding the condition and worth of the particular collateral in question and whether it should be valued below or above the published value which is used as the starting point." *Id.* (quoting *Chrapliwy*, 207 B.R. at 473-74). While the N.A.D.A. retail value or the loan payoff are relevant, the Court will also take into consideration testimony regarding a vehicle's condition or history when assigning a value.

12

At the time of the repossession, the payoff for the 2001 Pontiac Bonneville was in the amount of $4,392.58. The N.A.D.A. retail value for the vehicle was not entered into evidence at trial but the evidence does indicate that the vehicle sold for a cash price of $6,500.00. The Court therefore finds the value of the vehicle to be in the amount of $6,500.00. As the payoff for the vehicle, in the amount of $4,392.58, is less than the value of the vehicle, the Court holds that the Plaintiff is entitled to damages in that amount for the loss of the 2001 Pontiac Bonneville.

The N.A.D.A. retail value of the 1997 Jaguar XJ6, at the time of repossession, was in the amount of $5,000.00. The payoff for the vehicle was in the amount of $12,718.77. Nonetheless, at trial, the Debtor testified that when the vehicle was dropped off at the sales lot, the fuel rail was leaking. Despite having the fuel rail replaced, the vehicle would still not pass inspection, and the parties decided to sell the vehicle at wholesale for $100.00. The Court finds this sales price to be the most credible evidence of its value. Accordingly, the Court holds that the Plaintiff is entitled to damages in the amount of $100.00 for the loss of the 1997 Jaguar XJ6.

## II. *Plaintiff's Claim Pursuant to § 523(a)(6)*

In his closing argument, the attorney for the Plaintiff argued that the debt owed by the Debtor to the Plaintiff is nondischargeable pursuant to § 523(a)(6). Section 523(a)(6) of the Code dictates that "[a] discharge under section 727 . . . of this title does not discharge an individual debtor from any debt for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Such a debt will only be excepted from discharge if the creditor to whom the debt is owed requests a hearing on the matter and the court determines that the debt should be excepted. 11 U.S.C. § 523(c)(1). The complaint alleging nondischargeability must be filed within 60 days after the first date set for the creditors'

Bankruptcy Code § 341 meeting. Fed. R. Bankr. P. 4007(c). Rule 4007(c), which governs the "time limits for filing complaints objecting . . . to dischargeability of a debt," is akin to a "[statute] of limitations and is strictly construed." *KWHK Broadcasting Co., Inc. v. Sanders (In re Bozeman)*, 226 B.R. 627, 630 (8th Cir. B.A.P. 1998).

The Plaintiff's Complaint is devoid of any reference to § 523(a)(6). No amended complaint was ever filed with the Court. In addition, the Plaintiff did not list the claim pursuant to § 523(a)(6) as a "Contested Issue for Trial" in its "Final Pre-Trial Disclosures." Rule 7015(b) permits a party to amend its complaint to conform to the evidence admitted at trial. Fed. R. Bankr. P. 7015(b). Normally, motions to amend a complaint to conform to the evidence admitted at trial are "liberally allowed," see *Douglas v. Kosinski (In re Kosinski)*, 424 B.R. 599, 614 (1st Cir. B.A.P. 2010), and will be granted "so long as the opposing party has not been prejudiced in presenting his case." *Brandon v. Holt*, 469 U.S. 464, 471 n. 19 (1985) (internal citation omitted). In the present case, though, the Plaintiff never sought to amend its Complaint to include a claim against the Debtor for willful and malicious injury to property. Because the time limit for filing a claim objecting to dischargeability pursuant to § 523(a)(6) expired 60 days after the creditors' Bankruptcy Code § 341 meeting, and because no motion to amend the complaint to conform to the evidence admitted at trial was made, the Plaintiff's claim against the Debtor for willful and malicious injury to property must be denied. *See Citibank v. Dishman (In re Dishman)*, 257 B.R. 780, 783 (Bankr. E.D. Va. 2000) ("[N]o provision is afforded the court by case law, statutory authority, nor public policy to allow the court to exercise general equitable powers of discretion to deviate from the provisions of Rule 4007(c)."); *Sfakios v. Calafiore (In re Calafiore)*, 237 B.R. 249, 251 (Bankr. D. Conn. 1999) (holding that the creditor's claim pursuant to § 523(a)(6)

14

is barred because the complaint was not timely filed); *In re Connor*, 50 B.R. 213, 216 (Bankr. M.D.N.C. 1985) (stating that "the court lacks discretion and authority to extend the time to file a dischargeability complaint").

## **<u>CONCLUSION</u>**

The court will enter a judgment consistent with the findings of fact and conclusions of law as set forth in this memorandum opinion.

# SERVICE LIST

Jamie Dale Casper
4617 Kellys Trail
Winston-Salem, NC 27101-2319

Winston-Salem City Employees's Federal Credit Union
c/o James E. Vaughan
P. O. Drawer 25008
Winston-Salem, NC 27114